Filed 3/8/24  P. v. Sanchez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MANUEL MICHAEL SANCHEZ,<br><br>    Defendant and Appellant. | H050599<br>(Monterey County<br>Super. Ct. No. 21CR002655) |

A jury convicted appellant Manuel Sanchez of murder, attempted murder, and weapons offenses, after a shooting that killed one person and wounded another.  The trial court sentenced Sanchez to a determinate term of 18 years in prison, consecutive to an indeterminate term of 50 years to life.

On appeal, Sanchez argues the trial court erred in admitting the following evidence at trial: (1) photographs and testimony regarding his tattoos, and (2) statements made to police by two witnesses, neither of whom appeared at trial, following the shooting.  With respect to the evidence of his tattoos, Sanchez argues in the alternative that trial counsel was constitutionally ineffective for not seeking to exclude that evidence.  Finally, Sanchez claims that these errors were cumulatively prejudicial.

As to his sentencing, Sanchez argues the jury's findings on the aggravating factors were not supported by substantial evidence or, in the alternative, the jury was misinstructed on those factors.  Sanchez also contends that trial counsel was ineffective

for failing to object to the deficient aggravating factors and the corresponding jury instructions.[1]

As we explain below, we conclude that none of Sanchez's arguments have merit. We will affirm the order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Charges, verdict, and sentencing

On July 25, 2022, the Monterey County District Attorney filed a first amended information charging Sanchez with one count of murder (§ 187, subd. (a); count 1), two counts of attempted murder (§§ 187, subd. (a), 664; counts 2, 3), two counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 4, 5), and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 6).

As to counts 1 and 2, the information alleged that Sanchez personally and intentionally discharged a firearm inflicting great bodily injury or death on the victims (§ 12022.53, subd. (d)) and, as to count 3, that Sanchez personally and intentionally discharged a firearm (§ 12022.53, subd. (c)). With respect to counts 4 and 5, the information alleged that Sanchez personally used a firearm (§ 12022.5, subd. (a)) and, as to count 4, also alleged that Sanchez inflicted great bodily injury on the victim (§ 12022.7, subd. (a)). Finally, the information alleged a number of aggravating factors, specifically, that: "(a)(1) The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; [¶] (a)(2) The defendant was armed with or used a weapon at the time of the commission of the crime; [¶] (a)(3) The victim[s] [were] particularly vulnerable. [¶] …

---

[1] In his opening brief, Sanchez also argued there was a discrepancy between the trial court's oral pronouncement at sentencing and the minute order as to a restitution fund fine (§ 1202.4, subd. (b)). Sanchez subsequently withdrew that argument and we do not consider it.

[¶] (b)(1) The defendant has engaged in violent conduct that indicates a serious danger to society; [¶] (b)(2) The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness; [and] [¶] (b)(3) The defendant has served a prior term in prison or county jail under section 1170(h)." (Cal. Rules of Court, rule 4.421(a)(1)-(3), (b)(1)-(3).)[2]

After a trial, the jury found Sanchez guilty on all counts and found true all of the firearm enhancement allegations. The jury also found true certain of the aggravating factor allegations.[3] Specifically, as to counts 1 through 5, the jury found true the aggravating factors that: (1) the crime involved great violence, great bodily harm, threats of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (rule 4.421(a)(1)); and (2) Sanchez was armed with or used a weapon at the time of the commission of the crime (rule 4.421(a)(2)). As to count 1, the jury also found true the aggravating factor that the victim was particularly vulnerable (rule 4.421(a)(3)).

On November 17, 2022, the trial court sentenced Sanchez to an indeterminate term of 50 years to life, consisting of the base term of 25 years to life on count 1 (§ 187, subd. (a)) consecutive to an additional term of 25 years to life due to the firearm enhancement (§ 12022.53, subd. (d)). The trial court also imposed a consecutive determinate term of 18 years, consisting of consecutive upper terms of nine years on counts 2 and 3 (§§ 187, subd. (a), 664) but striking the firearm enhancements (§ 12022.53, subds. (c), (d)) on each of those counts. On count 4 (§ 245, subd. (b)), the trial court imposed, but stayed

---

[2] Unspecified rule references are to the California Rules of Court.

[3] The jury was not instructed on and made no findings as to the three aggravating factors set forth in rule 4.421(b), i.e., that Sanchez "engaged in violent conduct that indicates a serious danger to society[,]" that his "prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness[,]" and that Sanchez "has served a prior term in prison or county jail under section 1170[, subd.] (h)."

under section 654, the upper term of nine years plus a consecutive four–year term due to the firearm enhancement (§ 12022.5, subd. (a)) and a consecutive three–year term for the great bodily injury enhancement (§ 12022.7, subd. (a)). On count 5 (§ 245, subd. (b)), the trial court also imposed, but stayed under section 654, an upper term sentence of nine years plus a consecutive four–year term for the firearm enhancement (§ 12022.5, subd. (a)). Finally, the court imposed a concurrent middle term sentence of two years on count 6 (§ 29800, subd. (a)(1)).

Sanchez timely appealed.

### B. Factual background

#### 1. Shooting and police response

At 10:14 p.m. on April 7, 2021,[4] Salinas police officers responded to a report of a shooting in an area where a number of transients had set up tents. The "tent city" was located in an industrial and commercial zone along a set of railroad tracks.

Salinas Police Department Officer Jared Reyes and his partner were the first to arrive at the site. As the officers arrived, a man, later identified as Brandon H.,[5] approached them. Reyes could see that Brandon H. was bleeding from a wound to his left shoulder. Brandon H. told Reyes that he had been shot and pointed toward a nearby tent, saying that his friend had also been shot. As the officers approached the tent, they could hear a woman inside screaming, " 'Hurry. He needs help.' " Reyes and his partner entered the tent and found Sandra M. bent over the body of an 18–year–old male, Adam G., who had been shot in the head. Reyes rendered medical assistance until paramedics arrived and then followed the ambulance to the hospital to try to obtain a statement from

---

[4] Unless otherwise specified, all dates are from the year 2021.

[5] We refer to the victims and witnesses by their first names and last initials to protect their privacy interests. (Rule 8.90(b)(4).)

Adam G. However, Adam G. remained unresponsive and eventually died from his wound.[6]

Officer Chris Webb arrived on the scene shortly after Reyes and encountered Sandra M. and Brandon H., both of whom appeared "worried, scared, [and] distraught." Sandra M. was not injured, although she had blood on her jacket, apparently from Adam G. She told Webb that she and Adam G. had been inside the tent when the shooter came inside and asked for someone named Face. Sandra M. said that Face was not there[7] and the shooter left the tent. He stood outside for approximately seven minutes before firing eight to ten shots into the tent. Sandra M. said the shooter was wearing a black sweater, blue jeans, and either a hat or a beanie. She also said the shooter had tape on his nose, as if it was broken. Webb asked Sandra M. which way the shooter went, and she pointed toward the railroad tracks.

Officer Anthony Yates interviewed Brandon H. at the scene.[8] Brandon H. told Yates that the shooter was about 5 feet 10 inches tall, "chubby[,]" and was wearing a blue bandana, blue jeans, and a dark hooded sweatshirt. Brandon H. also told Yates he saw a white Camaro on an adjoining street and made several different statements about that vehicle. At first, he said that he saw the shooter get into that vehicle and drive away after the shooting. Brandon H. later said that he chased after the shooter who ran across the railroad tracks and a white Camaro drove past on a nearby street, but he did not actually see the shooter get into that vehicle. At another point in the interview, Brandon H. said he saw the shooter get out of the white Camaro.

---

[6] It is not clear from the record when Adam G. died, but the autopsy was performed on April 14, 2021.

[7] Sandra M. told Webb that the tent belonged to Face and she and Adam G. were there "hanging out."

[8] Yates does not speak Spanish, therefore a second officer served as a translator during the interview.

### 2. Sanchez's arrest

As officer Nicholas Abruzzini responded to the shooting, he received a description of the shooter and his last reported direction of travel. According to the dispatch, the shooter was a "Hispanic male adult, medium heavy-set build, wearing a black hooded sweatshirt, black hat, white mask and some color or dark jeans." The dispatch further advised that the suspect was traveling "on Industrial [Street] toward Vertin Avenue." Officer Abruzzini drove to the area and saw a man, later identified as Sanchez, in an alley between warehouse-style buildings. Although the nearby buildings appeared to contain businesses, all those businesses were closed at that time of night.

According to Abruzzini, when he first saw Sanchez in the alley, Sanchez was "pacing between the buildings, walking in weird directions, kind of stepping out into the alleyway back and forth, looking over his shoulder, acting very oddly." There was no one else in the area, which was approximately 300 yards from where the shooting took place.

Abruzzini drove up to Sanchez and asked him, " 'Do you know where you are right now?' " Sanchez looked at Abruzzini, tried a nearby door handle on the building and said, " 'Well, I work here. I'm trying to get back to work.' " According to Abruzzini, Sanchez was sweating "profusely [] and [] visibly shaken, upset." When the door failed to open, Sanchez walked further down the alley before Abruzzini got out of his patrol car and placed him under arrest.

Abruzzini searched Sanchez and found a .22–caliber semi–automatic handgun in his waistband. The weapon was partially loaded with live rounds, but the magazine was inserted into the gun backwards. Sanchez also had six live rounds of .22–caliber ammunition in the front pocket of his sweatshirt. At the time of his arrest, Sanchez was wearing a black hooded sweatshirt with prominent multicolored lettering on it, a pair of gray sweatpants with three black stripes along the legs, which were worn over a pair of

black shorts. On his face, Sanchez was also wearing a white mask over a blue surgical mask.

### 3. Subsequent police investigation

Following Sanchez's arrest, police located a white Ford Expedition parked on Industrial Street near the railroad tracks. After obtaining a search warrant, officers opened the vehicle and found a wallet with Sanchez's driver's license and social security card.

The vehicle was registered to Dolores O., Sanchez's grandmother, and she testified that Sanchez was living with her in April of 2021. Dolores O. would sometimes lend Sanchez her car and confirmed that she did so on April 7. However, Dolores O. did not remember speaking with a police detective the day after the shooting. She also denied that Sanchez told her on April 7 that he felt like hurting or killing someone.[9]

Police investigators also recovered surveillance video footage, some with audio, from three businesses in the area. Salinas police detective John Richardson reviewed the footage and observed a person whose clothing and build matched Sanchez's description and the clothing he was wearing when he was arrested.

Detective Richardson described the video which showed a "white or light colored SUV" parked near the scene of the shooting about 9:57 p.m., approximately 14 minutes before shots are heard. Around 10:00 p.m., Sanchez gets out of the SUV and walks away from the scene of the shooting and out of view of the camera. The video then shows "one individual or a shadow of an individual" walking back toward the railroad tracks, i.e., in the direction of the "tent city."

---

[9] Salinas police detective Pedro Gomez testified that he interviewed Dolores O. on April 8 while his body camera was activated. A portion of the videotaped interview was played for the jury and admitted into evidence. On the video, Dolores O. tells detective Gomez that, on April 7, Sanchez "kept saying … I just feel like, um, beating up somebody … or killing somebody … doing something so that the cops will shoot me."

At 10:11 p.m., or 11 minutes after Sanchez got out of his SUV, the audio picks up two gunshots and Sanchez can be seen running back from the railroad tracks to the SUV. Sanchez approaches the driver's side door and the interior light of the vehicle comes on. Sanchez does not get in but instead goes to the front of the vehicle. He then looks toward the railroad tracks before running down Industrial Street.

Other videos from different angles show Sanchez running away from the SUV as two people come toward him across the railroad tracks. As those persons cross the tracks, Richardson testified that, "you could see three muzzle flashes or flashes of light, which I determined to be muzzle flashes, as they're running toward [Sanchez's] direction." A few minutes after the muzzle flashes, the video shows a white Camaro driving by.

Investigators recovered two .22–caliber shell casings near the tent and several more shell casings "in the dirt area between Industrial Street and the railroad tracks." The shell casings found by the railroad tracks were larger than what could be used in a .22-caliber firearm, but police never recovered a larger caliber firearm in the course of this investigation.

Rachel Frase, a senior criminalist with the state Department of Justice Bureau of Forensic Sciences, testified that she test fired the .22–caliber handgun found on Sanchez when he was arrested, comparing the bullet and cartridge casings to those found at the scene of the shooting. In Frase's opinion, her analysis of the bullets was inconclusive, as there were "not enough individual characteristics … to say one way or the other" that the bullets recovered in this case were fired from the same weapon. However, in her opinion, the test–fired cartridges and the cartridges recovered from the scene of the shooting came from the same firearm.

On cross-examination, Frase confirmed that she was not provided and did not analyze any bullets or cartridge casings larger than a .22-caliber. Frase also testified that, if the magazine were inserted backwards, the gun would not fire.

#### 4. Gang–related evidence

F.F. testified that Adam G., who was killed inside F.F.'s tent, was his friend and would "hang out" with him in that tent. F.F. said that he also went by the name "Face," and when asked if he knew why anyone would want to shoot at his tent, he responded, "No. Not really. Just the fact that I'm a [gang] dropout." F.F. explained that he had been a member of a Norteño gang for around ten years but dropped out approximately three years before the shooting.

The jury was shown a number of photographs from the scene of the shooting, including a photograph of the exterior of F.F.'s tent. During cross–examination, defense counsel showed that photograph to the officer who took it and asked if the officer could see that some graffiti or lettering on the tent included the letters "BK." Although the officer said he could not make out those letters in the photograph, he confirmed that "BK" could refer to "buster killer" and that "buster" is a derogatory term for Norteño gang members.[10]

Monterey County Deputy Sheriff Federico Tinoco testified that he is assigned to the classification unit and "interviews, evaluates[,] and assesses inmates when they come into custody." As a classification officer, his objective is "keeping everybody safe" while in custody and therefore they segregate inmates based on their gang affiliation. Consequently, Norteño gang members and associates are housed in the Norteño housing unit and Sureño gang members and associates are housed in the Sureño unit. The gang

---

[10] The prosecution's gang expert also testified that "BK" would, in gang circles, be shorthand for "buster killer" and would be used by someone who "views Norteños as their enemy and [] wants to kill them or eliminate them."

members themselves also verify whether someone who is placed in their unit is in good standing with or is associated with their gang, and if they are not, the inmates will assault that person. Sanchez was placed in the Norteño housing unit after his arrest and, as far as Tinoco was aware, Sanchez had not been attacked by other inmates during the 16 months he was in custody prior to trial.

Salinas police detective Ruben Sanchez testified as an expert on the investigation of gang–related crimes in Monterey County and Norteños in particular. According to detective Sanchez, Norteños saw people who dropped out of their gang as traitors, particularly because dropouts would be able to give police critical information about the gang's crimes and tactics. Because Norteños viewed dropouts as a "liability," every dropout had a "green light," meaning they could be killed by other gang members.

In preparing for trial and to determine Sanchez's gang status, detective Sanchez familiarized himself with, among other things, Sanchez's tattoos. On his chest, Sanchez had a tattoo of "a Huelga bird, or an eagle[,]" which Norteños used as a symbol. On his forehead, Sanchez had a tattoo of the letter "N," representing "Norteño or Norte, Northerner." The prominent visible display of such a tattoo was significant because it was "like a billboard" signaling his gang affiliation to both the public as well as the gang's enemies.

On one of Sanchez's shoulders, he had a tattoo of the letters "SK," which detective Sanchez testified could mean "scrap killer or Sureño killer." Sanchez also had a tattoo on his right forearm that read "D.O killa" which was a reference to killing dropouts. On his left forearm, Sanchez had an "X4" tattoo, and detective Sanchez testified that "X" was the Roman numeral 10. Adding the "4" totaled "14" which is a number Norteños identify with because "N" is the 14th letter of the alphabet. On his neck, Sanchez had a tattoo of the letters "EM" and, according to detective Sanchez, this was a reference to Salinas East Market, one of the oldest Norteño gangs in Salinas.

10

Based on Sanchez's tattoos and his assignment to a Norteño unit in the county jail, it was detective Sanchez's opinion that Sanchez was an active member of a Norteño criminal street gang at the time of the April shooting.

## II.   DISCUSSION

### A. Admission of evidence of Sanchez's tattoos

Sanchez contends that the trial court erred in admitting evidence of his tattoos on both statutory and due process grounds. As discussed below, we disagree.

#### 1. Evidence Code section 352.2 is not retroactive

Sanchez first argues that Evidence Code section 352.2, which came into effect less than two months after he was sentenced, applies retroactively and the matter must be remanded to the trial court for it to consider the admissibility of his tattoos pursuant to that statute. He cites *People v. Venable* (2023) 88 Cal.App.5th 445, review granted May 17, 2020, S279081 (*Venable*), in support of this argument. We disagree with *Venable* and conclude that Evidence Code section 352.2 is not retroactive.[11]

#### a. Additional background

Before trial, the prosecution moved in limine to introduce evidence of Sanchez's "D.O Killa" tattoo on the ground that it was probative of Sanchez's "state of mind and motive." The prosecution also sought an in limine order to photograph Sanchez's other tattoos as motive evidence. The trial court granted both of the motions, stating that if the evidence at trial showed that Sanchez was in a gang and that he was looking for a gang dropout on the night of the shooting, the tattoos would be relevant evidence of motive.

At trial, the prosecution moved to introduce photographs of several of Sanchez's tattoos as evidence of motive and intent. The trial court allowed the evidence to be

---

[11] Because we do not agree that Evidence Code section 352.2 applies retroactively, we need not and do not consider the Attorney General's argument that tattoos are not a form of creative expression that falls within the ambit of the statute.

admitted, stating that there were "strong reasonable inferences that the … crime was committed for gang-related reasons. [¶] The strongest reason being that the intended victim was a dropout of a Norteño gang. The defendant's membership or association with that gang is highly relevant to explain the motivation in this case. So any evidence showing gang association or relationship would be relevant. [¶] … So these tattoos all appear to be relevant to show gang membership. With respect to the specific tattoo DO killer [*sic*], that is further identifying, frankly, labeling motivation. It's very specific to this actual individual, and it clearly ties the motivation to the defendant and the alleged victim in this case based upon … the intended victim's testimony that he was a dropout." Although the trial court did not specifically reference Evidence Code section 352 in its discussion, it stated that it found the tattoo evidence both "highly relevant" and prejudicial but concluded that it did not "find the prejudice outweighs its relevance or probative value."

After the close of evidence, the jury was instructed it could only consider the gang evidence to decide whether Sanchez had a motive or the intent necessary to commit the charged offenses. The jury was further instructed that it could not consider that evidence for any other purpose and it could not "conclude from this evidence that [Sanchez] is a person of bad character or that he has a disposition to commit crime."

### b. Analysis

Evidence of a defendant's criminal disposition, including evidence that he is a member of or associated with a criminal street gang, is inadmissible to prove he committed a specific criminal act. (Evid. Code, § 1101; *People v. Williams* (1997) 16 Cal.4th 153, 193; *People v. Champion* (1995) 9 Cal.4th 879, 922.) However, pursuant to Evidence Code section 1101, subdivision (b) evidence of "a crime, civil wrong, *or other act*" is admissible to prove something other than the defendant's character, specifically "motive, opportunity, intent, preparation, plan, knowledge, identity, [etc.]" (Italics

12

added.)  Before it may be admitted, the trial court must determine that it is both relevant to prove a fact at issue (Evid. Code, § 210), and that its probative value is not outweighed by its prejudicial effect (Evid. Code, § 352).  "Although evidence of gang membership carries the potential for prejudice, it ' "is often relevant to, and admissible regarding, the charged offense.  Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." ' [Citation.]" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 772.)

Effective January 1, 2023, Assembly Bill No. 2799 (2021-2022 Reg. Sess.) added section 352.2 to the Evidence Code.  (Stats. 2022, ch. 973, § 2.)  The statute provides additional procedures and factors for the trial court to consider in a criminal proceeding before admitting evidence of creative expression under Evidence Code section 352. (Evid. Code, § 352.2, subds. (a), (b).)  In uncodified portions of the bill, the Legislature declared that among its purposes in enacting the statute was to guard against introducing stereotypes or activating bias and to exclude character or propensity evidence against the defendant.[12]  (Stats. 2022, ch. 972, § 1, subd. (b).)

---

[12] Evidence Code section 352.2 provides: "(a) In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under [Evid. Code] Section 352, shall consider, in addition to the factors listed in [Evid. Code] Section 352, that:  (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of [Evid. Code] Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings.  [¶]  (b) If proffered and relevant to the issues in the case, the court shall

In *Venable*, *supra*, the court concluded that Evidence Code section 352.2 has an ameliorative effect and thus applies retroactively to cases not yet final on appeal. (*Venable*, *supra*, 88 Cal.App.5th at p. 456.)  In that case, which involved a gang-related murder, the prosecution introduced into evidence a rap video, posted on YouTube, featuring the defendant, the defendants' younger brother, and other gang members, flashing gang signs and displaying guns, drugs, and money.  (*Id*. at p. 452.)  The lyrics included a line that the prosecution's gang expert testified meant that the defendant's younger brother had heard that a gang member shot someone in the head on the street where the charged murder occurred.  (*Id*. at pp. 452-453.)

In finding that Evidence Code section 352.2 has retroactive application, *Venable* relied heavily on *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*), in which the California Supreme Court explained that ' "[t]he *Estrada* rule rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not." ' (*Frahs, supra*, 9 Cal.5th at p. 628.)"  (*Venable*, *supra*, 88 Cal.App.5th at p. 456.)  Although the statute at issue in *Frahs*, which gave trial courts discretion to grant pretrial diversion in certain

consider the following as well as any additional relevant evidence offered by either party: [¶]  (1) Credible testimony on the genre of creative expression as to the social or cultural context, rules, conventions, and artistic techniques of the expression.  [¶]  (2) Experimental or social science research demonstrating that the introduction of a particular type of expression explicitly or implicitly introduces racial bias into the proceedings.  [¶]  (3) Evidence to rebut such research or testimony.  [¶]  (c) For purposes of this section, 'creative expression' means the expression or application of creativity or imagination in the production or arrangement of forms, sounds, words, movements, or symbols, including, but not limited to, music, dance, performance art, visual art, poetry, literature, film, and other such objects or media.  [¶]  (d) The question of the admissibility of a form of creative expression shall be heard in limine and determined by the court, outside the presence and hearing of the jury, pursuant to [Evid. Code] Section 402.  The court shall state on the record its ruling and its reasons therefor."

cases "was procedural and … didn't directly reduce punishment … the [California] Supreme Court dug deeper." (*Venable*, *supra*, at p. 456.) The *Venable* court was persuaded that the appropriate consideration is whether the statute " 'by design and function' " provides the potential for an ameliorative effect even where the "legislative changes … did not directly or necessarily affect punishment." (*Id.* at pp. 456-457, quoting *Frahs*, *supra*, at p. 624.)[13]

*Venable* was further persuaded by this court's majority opinion in *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743 (*Burgos*), finding that newly enacted section 1109, which permitted defendants to request a bifurcated trial of gang charges and enhancements, had retroactive effect. (*Venable*, *supra*, 88 Cal.App.5th at p. 457.) The important point expressed in *Burgos*, according to *Venable*, was that "bifurcation increases the possibility of acquittal, 'which necessarily reduces possible punishment.' (*Burgos*, at p. 567, review granted.)" (*Venable*, *supra*, 88 Cal.App.5th at pp. 457-458.)

Respectfully, we do not agree with the conclusion reached in *Venable* that Evidence Code section 352.2 is retroactive. The Legislature, acting within its authority, has determined that additional safeguards are necessary before "creative expression" can be introduced by "a party." (Evid. Code, § 352.2, subd. (a).) Although the new statute requires trial courts to exercise heightened caution in deciding whether to admit such evidence, in enacting Evidence Code section 352.2, the Legislature has not prohibited forms of creative expression from being utilized in a criminal proceeding.

---

[13] The *Venable* court also cited *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299 (*Lara*) in which the California Supreme Court concluded that Proposition 57, which changed certain juvenile court procedures, had retroactive application. (*Venable*, *supra*, 88 Cal.App.5th at p. 457.) Again, it was the Supreme Court's emphasis on how the "effect of the change was to increase the likelihood of a lesser sentence for a class of defendants" that was important to the analysis in *Venable*. (*Ibid.*)

15

"Generally, statutes are presumed to apply only prospectively. [Citation.]" (*Frahs*, *supra*, 9 Cal.5th at p. 627.) In *Estrada*, the California Supreme Court held "that amendatory statutes that lessen the punishment for criminal conduct are ordinarily intended to apply retroactively." (*Frahs*, *supra*.) In assessing whether Evidence Code section 352.2 is retroactive, we believe the statute is considerably different from the changes in law made in the cases relied upon by *Venable*. For example, we are not dealing here with an amendatory act that "ameliorated the possible punishment for a *class of persons*." (*Lara, supra*, 4 Cal.5th at p. 308 [i.e., juveniles] (italics added); see also *Frahs*, *supra*, 9 Cal.5th at p. 631 [i.e., defendants who suffer from a qualifying mental disorder].) Evidence Code section 352.2 applies to *any* criminal proceeding in which "*a party*" seeks to introduce evidence of creative expression. (*Id*. at subd. (a), italics added.)

We conclude that any link between Evidence Code section 352.2's additional lens for evaluating evidence of creative expression and a lessening of punishment for criminal conduct is too attenuated to warrant retroactive application. Although the Legislature, in enacting Evidence Code section 352.2, may have been concerned about bias against people of color and people who express themselves in ways that are stereotypically associated with people of color, the statute is not so narrow in scope. While it will likely be utilized most frequently in gang cases, the statute itself does not contain any such limitation, nor is it limited to any particular *form* of creative expression, whether it be music, lyrics, or, as in this case, tattoos.

In our view, the statute may be used by *any* party to a criminal proceeding, not just a defendant. For example, the prosecution could invoke Evidence Code section 352.2 in a case where a defendant offers the creative expression of a codefendant or a third party in an attempt to implicate that other person for the crime(s) at issue. Assuming the prosecution succeeded in excluding creative expression evidence offered by a defendant in such a case, the impact of the statute would be the *opposite* of ameliorative.

Our research has disclosed no case, aside from *Venable*, which has held that an amendment to the Evidence Code has retroactive application.[14] In *Frahs*, the statutory changes at issue were to the Penal Code. (*Frahs*, *supra*, 9 Cal. 5th at pp. 626-627.) In *Lara*, the changes were to the Penal Code and the Welfare and Institutions Code by way of Proposition 57. (*Lara*, *supra*, 4 Cal.5th at p. 303.) In criminal cases, the prosecution, the defense, and the trial courts apply the existing rules of evidence to determine what evidence is and is not admissible. We conclude that the changes imposed by Evidence Code section 352.2 do not apply retroactively.

However, as explained in our discussion of Sanchez's Evidence Code section 352 argument below, even if Evidence Code section 352.2 were retroactive, Sanchez cannot show that he was prejudiced in light of the other evidence of his guilt presented to the jury.

### 2. No abuse of discretion in admitting tattoo evidence under Evidence Code section 352

Sanchez next argues that, even if Evidence Code section 352.2 does not apply, the trial court improperly concluded that the tattoo evidence was not more prejudicial than probative under Evidence Code section 352. In Sanchez's view, the trial court should have determined when he got the tattoos in question, i.e., whether the acquisition of the tattoos was remote in time to when the shooting took place, as well as taken into consideration the fact that no rival gang members or Norteño dropouts were injured or killed in the shooting. Sanchez also asserts that, to the extent the tattoos established his gang membership, it was cumulative to the testimony presented by both the gang expert

---

[14] We do not foreclose the possibility that a future change to the Evidence Code could be deemed ameliorative and within the spirit of *Estrada*. The Fourth District Court of Appeal, Division One, and the Third District Court of Appeal have disagreed with *Venable* and held that Evidence Code section 352.2 is not retroactive. (*People v. Ramos* (2023) 90 Cal.App.5th 578, 596, review granted July 12, 2023, S280073; *People v. Slaton* (2023) 95 Cal.App.5th 363, review granted Nov. 15, 2023, S282047.)

and the classification officer and that the trial court failed to consider the propensity inferences a jury would draw based on Sanchez's race.  We disagree.

### a. Applicable legal principles

We review the trial court's evidentiary rulings for an abuse of discretion.  (*People v. Waidla* (2000) 22 Cal.4th 690, 717 (*Waidla*).)  A court has broad discretion under Evidence Code section 352 to exclude relevant evidence if it determines the probative value is substantially outweighed by its possible prejudicial effects.  (*People v. Merriman* (2014) 60 Cal.4th 1, 74 (*Merriman*), citing *People v. Clark* (2011) 52 Cal.4th 856, 893.)

" 'Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative.  [Citations.]  . . .  [¶]  However, gang evidence is inadmissible if introduced only to "show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense.  [Citations.]" ' "  (*People v. Coneal* (2019) 41 Cal.App.5th 951, 964.)  The California Supreme Court has made clear that gang evidence is admissible, even in non-gang cases, so long as that evidence is " ' "relevant to an issue of motive or intent." ' "  (*People v. McKinnon* (2011) 52 Cal.4th 610, 655.)  However, " '[e]ven where gang membership is relevant,' . . . 'because it may have a highly inflammatory impact on the jury trial courts should carefully scrutinize such evidence before admitting it.' "  (*Ibid.*)  In such cases, the probative value of such evidence in establishing a defendant's motive " ' "generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' "  (*Ibid.*)

"We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' "  (*Merriman*, *supra*, 60 Cal.4th at p. 74, quoting *People v. Brown* (2003) 31 Cal.4th 518, 534.)  Generally, the application of ordinary rules of evidence does not implicate the federal Constitution; accordingly, we

18

review allegations of error under the "reasonable probabilit[y]" standard of *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*), unless the erroneous admission of evidence affects the fundamental fairness of the trial, in which case we apply the de novo standard of review. (*People v. Marks* (2003) 31 Cal.4th 197, 227; *People v. Albarran* (2007) 149 Cal.App.4th 214, 224, fn. 7.)

### b. The trial court did not abuse its discretion in admitting the evidence under Evidence Code section 352

Sanchez was charged with shooting at three people, killing one and wounding another. According to the prosecution's theory of the case, Sanchez intended to kill F.F., a Norteño dropout, and the three victims were inside F.F.'s tent. As a result, evidence of Sanchez's tattoos were probative of his motive, i.e., killing Norteño dropouts. The prosecution's gang expert testified that Norteño gangs viewed dropouts as traitors and that every dropout was "green lit" for execution by the gang. The gang expert also confirmed that the photos of Sanchez's tattoos were a part of the evidence on which he relied in forming the opinion that Sanchez was an active Norteño gang member at the time of the shooting. "A trial court has wide latitude to admit evidence relevant to motive." (*People v. Johnson* (2019) 32 Cal.App.5th 26, 62.) Where, as here, the alleged motivation of the crime was gang related, "evidence tending to show" gang membership is "highly relevant." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373 (*Olguin*).)

In this case, the prejudicial impact of the gang evidence was limited. Although two witnesses testified to Sanchez's gang membership, there was no testimony regarding Norteños' specific criminal activities, aside from a homicidal animosity to both Sureños and Norteño dropouts, or any other gang crimes committed by Sanchez. Furthermore, the trial court acknowledged the prejudicial weight of the evidence, though it found the probative value was greater. Mindful of the potential prejudice and misuse of the evidence, the trial court instructed the jury that it was to consider the evidence of gang

19

activity *only* to determine whether Sanchez had the motive or necessary intent to commit the charged offenses and it could not conclude from the evidence that Sanchez had a bad character or was predisposed to criminality.

On these facts and trial record, we conclude that the trial court did not abuse its discretion in admitting the photos of Sanchez's tattoos. (*Olguin*, *supra*, 31 Cal.App.4th at pp. 1372-1372.) Likewise, there was no violation of Sanchez's constitutional rights to due process. The admission here of probative evidence related to motive was both appropriate and unexceptional, and it did not render Sanchez's trial fundamentally unfair. (See *People v. Jones* (2013) 57 Cal.4th 899, 949; see also *People v. Lindberg* (2008) 45 Cal.4th 1, 26; *Jammal v. Van de Kamp* (9th Cir.1991) 926 F.2d 918, 920.)

### *c. No ineffective assistance in relation to tattoo evidence*

Sanchez next argues that his trial counsel was constitutionally ineffective for "failing to litigate the admissibility of the tattoos under Evidence Code section 352 and the due process clauses to the California and United States Constitutions." Sanchez's argument, as best we can follow, is that trial counsel only made "boilerplate pretrial objections" to the gang evidence and therefore failed to exclude the "tattoo evidence [which] played prominently in the prosecution's case." We disagree.

### *i. Applicable legal principles*

The standard for evaluating claims that counsel provided constitutionally ineffective assistance is set forth in *Strickland v. Washington* (1984) 466 U.S. 668, 687-694 [104 S. Ct. 2052, 80 L. Ed. 2d 674], which states: "[t]o secure reversal . . . upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's

shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

It is the defendant's burden of demonstrating by a preponderance of the evidence that his counsel's performance fell below an objective standard of reasonableness. (*In re Thomas* (2006) 37 Cal.4th 1249, 1257.) A "mere failure to object to evidence or argument seldom establishes counsel's incompetence." (*People v. Ghent* (1987) 43 Cal.3d 739, 772.) "Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.) Further, "[f]ailure to raise a meritless objection is not ineffective assistance of counsel." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90.)

### ii. Analysis

The record does not support Sanchez's argument for ineffective assistance of counsel. Defense counsel's in limine motion objected to gang evidence generally and requested that the court "make appropriate rulings on the parties['] anticipated proffered [gang related] evidence." The motion specifically noted that the evidence's "relevance must be evaluated against potential prejudice to [Sanchez] under California Evidence Code [section] 352." At trial, when the trial court considered whether to admit photographs of Sanchez's tattoos, defense counsel again argued that the tattoo evidence was not relevant because it was more prejudicial than probative. After the trial court

21

turned to consideration of the six tattoo photographs, defense counsel objected that the introduction of "anything beyond one tattoo" was unduly prejudicial since one tattoo would be sufficient to establish Sanchez's membership in or affiliation with a Norteño gang.

As discussed above, the trial court did not abuse its discretion in admitting the tattoo evidence nor did the admission of that evidence violate Sanchez's due process rights. Accordingly, defense counsel was not ineffective simply because he failed in his efforts to persuade the court that the evidence was more prejudicial than probative.

### d. Even assuming error, admission of the evidence was not prejudicial

Sanchez contends that the erroneous admission of the tattoo evidence was not harmless under either state or federal law.[15] We disagree.

To show reversible error under state law, Sanchez must show a reasonable probability of obtaining a more favorable result at trial if the evidence had been excluded. (*Watson, supra,* 46 Cal.2d at p. 836.) Sanchez also asserts that we should examine prejudice under the stricter federal standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) in which the burden would be on the Attorney General to show the error was harmless beyond a reasonable doubt. Because we have already determined that the trial court did not abuse its discretion in admitting the tattoo evidence and Sanchez has not shown that introduction of the evidence rendered his trial fundamentally unfair, we will apply the standard set forth in *Watson* although we conclude there was no prejudice under either approach.

---

[15] As to Sanchez's contention that the evidence of his tattoos raised implicit racial and gender stereotypes, specifically that young Latino males are violent, Sanchez does not point to anything in the trial court record which reflects such alleged biases played any role in this trial. (Rule 8.204(a)(1)(C).) Allegations that are not supported by references to the record will be deemed forfeited. (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745.)

22

In this case, the jury was instructed that it could "consider evidence of gang activity only for the limited purpose of deciding whether [Sanchez] had a motive to commit the crimes charged or [Sanchez] had the intent necessary for the crimes charged in Count[s] 1, 2[,] and 3." The jurors were also instructed that they "may not consider this evidence for any other purpose[] [and] may not conclude from this evidence that [Sanchez] is a person of bad character or that he has a disposition to commit crime."

Ultimately, Sanchez cannot show prejudice under either *Watson* or *Chapman* due to the ample evidence aside from his tattoos establishing his guilt. The prosecutor emphasized in rebuttal argument that Sanchez was not on trial "because [he is] a gang member and has gang tattoos." According to the prosecutor, the evidentiary value of Sanchez's "D.O killa" tattoo was tied to the other evidence showing that he went looking for F.F. that night and, within minutes of the shooting, was apprehended in the area with the murder weapon on his person.

In addition, the prosecution's gang expert opined that Sanchez was a Norteño gang member and that Norteños considered dropouts to be traitors who were subject to execution. Even without the evidence of Sanchez's tattoos, the jury saw the video footage of Sanchez running back to his SUV after the first shots can be heard, then running away from his vehicle down Industrial Street. The jury heard that Sanchez had a .22–caliber semi–automatic handgun in his waistband when he was arrested and that the cartridges test–fired from this weapon matched the .22–caliber cartridges recovered from the scene of the shooting. This evidence would have been sufficient for the jury to conclude that Sanchez was the person who shot at the three victims that night.

In light of the overwhelming evidence of guilt, any error in the admission of Sanchez's tattoos was not prejudicial applying either state or federal constitutional standards of prejudice. (*Watson*, *supra*, 46 Cal.2d at p. 836; *Chapman*, *supra*, 386 U.S. at p. 24.)

23

## B. Admitting the recorded statements did not violate Sanchez's Sixth Amendment rights

Sanchez next argues that the trial court erred in admitting the recorded statements of Sandra M. and Brandon H. as this testimony violated his rights under the Sixth and Fourteenth Amendments.[16]

### 1. Additional background

Before trial, Sanchez brought an in limine motion to exclude the evidence of statements recorded by police officers' body cameras when they spoke to Sandra M. and Brandon H. at the scene of the shooting.[17] The prosecution moved to admit those statements under the spontaneous statement exception to the hearsay rule provided by Evidence Code section 1240.[18] The trial court viewed the recordings and determined that the recorded statements of both witnesses/victims could be admitted.

As to Sandra M.'s statements, the trial court indicated that she was "clearly under the stress of the event" after a person she viewed as a son, i.e., Adam G., was shot in

---

[16] Sanchez's in limine motion argued that these statements must be excluded because their admission would violate his Sixth Amendment right to confront adverse witnesses under *Crawford v. Washington* (2004) 541 U.S 36 [124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*) and also that the hearsay statements were not admissible under the spontaneous statements exception set forth in Evidence Code section 1240. On appeal, Sanchez has abandoned his argument that the statements do not qualify as spontaneous statements, focusing exclusively on his objection under *Crawford* and the confrontation clause.

[17] The prosecution initially also sought to introduce Brandon H.'s statements to police after he was transported to the hospital for treatment of his gunshot wound and Sandra M.'s statements made during a subsequent interview at the police station. At the hearing on Sanchez's in limine motion, the prosecution confirmed that it was no longer seeking to introduce the recordings of those two statements.

[18] Evidence Code section 1240 provides that "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

24

front of her.  In the video, Sandra M. is "still crying, still trying to catch her breath" and "police [were] allowed to ask the victim to describe the attack."  The trial court noted that her "initial statements were going to the general basic facts of the incident" at a time when the police were still collecting "immediate info[rmation] to assist in catching a suspect at large in a homicide and attempted homicide."

The trial court similarly found that Brandon H. was "clearly under the stress of the event" when police spoke to him "within 9 minutes to … 11 minutes of the actual shooting."  Brandon H. had also been shot and was bleeding from his wound as he spoke to police.  The police officers' questions were "asked in order to deal with that emergency and … [were] pretty focused [on] … what happened, who are we looking for, where did they go?"

At trial, the police officers who interacted with Sandra M. and Brandon H. testified about their conversations at the scene and the videos of those conversations were played for the jury and admitted into evidence.

### 2. Applicable legal principles

"Hearsay is 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.'  (Evid. Code, § 1200, subd. (a).)  ….  Hearsay evidence is generally inadmissible unless it satisfies a statutory exception.  (Evid. Code, § 1200, subd. (b).)"  (*People v. Turner* (2020) 10 Cal.5th 786, 821.)  "To qualify for admission under the spontaneous statement exception to the hearsay rule, 'an utterance must first purport to describe or explain an act or condition perceived by the declarant.  (Evid. Code, § 1240, subd. (a).)  Secondly, the statement must be made spontaneously, while the declarant is under the stress of excitement caused by the perception.  (*Id*., subd. (b).)'  [Citation.]"  (*People v. Morrison* (2004) 34 Cal.4th 698, 718.)

In *Crawford*, *supra,* 541 U.S 36, the United States Supreme Court held that admission of "testimonial" hearsay violates the Confrontation Clause of the Sixth Amendment unless the declarant can be cross-examined at trial or the declarant is unavailable to testify at trial and the defendant had a prior opportunity for cross–examination. The California Supreme Court subsequently explained that "[i]n light of our [state] hearsay rules and [*Crawford*], a court addressing the admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*People v. Sanchez* (2016) 63 Cal.4th 665, 680.)

In *Davis v. Washington* (2006) 547 U.S. 813, 822 [126 S.Ct. 2266, 165 L.Ed.2d 224] (*Davis*), the U.S. Supreme Court described the rubric courts must use to determine whether statements to police or other government officials are "testimonial" or "nontestimonial." "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Ibid.*) In *People v. Chism* (2014) 58 Cal.4th 1266, the California Supreme Court explained that courts should

26

consider the following six factors[19] in deciding whether the statements qualify as testimonial: (1) an objective evaluation of the circumstances of the encounter and the statements and actions of the individuals involved; (2) whether the statements were made during an ongoing emergency or under circumstances that reasonably appeared to present an emergency, or were obtained for purposes other than for use by the prosecution at trial; (3) whether any actual or perceived emergency presented an ongoing threat to first responders or the public; (4) the declarant's medical condition; (5) whether the focus of the interrogation had shifted from addressing an ongoing emergency to obtaining evidence for trial; and (6) the relative formality of the statement and the circumstances under which it was obtained. (*Id.* at p 1289.) "The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial." (*Michigan v. Bryant* (2011) 562 U.S. 344, 367 [179 L. Ed. 2d 93, 131 S. Ct. 1143].) Whether there is an emergency depends "on the type and scope of danger posed to the victim, the police, and the public." (*Id.* at p. 371.)

On appeal, we undertake a de novo review of the question whether admission of evidence violated a defendant's Sixth Amendment right of confrontation. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1477-1478.) We evaluate the primary purpose for which a statement was taken under an objective standard, "considering all the circumstances that might reasonably bear on the intent of the participants in the conversation." (*People v. Cage* (2007) 40 Cal.4th 965, 984.)

### 3. Analysis

We begin our analysis by noting that, although the trial court did not expressly mention Evidence Code section 1240 when it ruled on in limine motions, it found that

---

[19] These six factors were originally set forth at greater length in *People v. Blacksher* (2011) 52 Cal.4th 769, 813-815.

27

both Sandra M. and Brandon H. were "under the stress of the event" when the recordings were made. It is clear that the statements at issue qualify for admission as spontaneous statements under that statute and Sanchez does not argue otherwise on appeal. Instead, he contends that, notwithstanding their admissibility under Evidence Code section 1240, the hearsay statements were testimonial and thus run afoul of *Crawford*'s prohibition.

Based on our de novo review, we conclude that the recorded statements of Sandra M. and Brandon H. were nontestimonial. The recordings took place within about 10 minutes of the shooting at which time both victims were under the stress of the event and Brandon H. was suffering from a gunshot wound to his shoulder. The officers' questions were principally focused on the shooter's physical description and the direction in which he fled, therefore helping the police respond to an ongoing emergency, i.e., locating and arresting an armed and dangerous suspect who was still at large.[20]

To the extent that the officers elicited information about what might have motivated the shooting, i.e., that Sanchez was looking for F.F., that information was also pertinent to understanding the possible scope of the emergency. For example, if the shooter was intent on shooting a particular person, such as F.F. in this case, police would want to try to locate F.F. to warn or protect him as well as try to find the suspect. If the shooter had instead either given no indication as to who he was targeting or expressed a

---

[20] We are not persuaded by Sanchez's assertion that, once a notification came in that a suspect generally matching the description(s) provided had been apprehended, every statement thereafter became testimonial. The notice consisted of the following: "[Unidentified] Speaker: **** someone matching **** Industrial at Vertin[,]" and "[Unidentified] Speaker: **** back alleyway where it dead ends into the businesses." First, it is unknown whether the police officer, whose attention was presumably focused primarily on talking to Sandra M., heard or processed these cursory and vague statements that came over the radio. Second, even if he had, the unidentified speaker did not say that a suspect had been taken into custody or that the (detained) individual had a . firearm on his person. Absent those critical details, the officer speaking to Sandra M. would have had no reason to believe the armed shooter was not still at large.

28

generalized desire to shoot anyone he came across, police would have greater concern for the safety of anyone the shooter might happen upon prior to his arrest.

Under the circumstances presented here, the officers' questions were designed to principally "meet an ongoing emergency" and the fact that some of the information provided was also evidence that could "establish or prove past events" does not render Sandra M.'s and Brandon H.'s recorded statements testimonial. (*Davis*, *supra*, 547 U.S. at p. 822.) Accordingly, the admission of those statements did not violate Sanchez's Sixth Amendment rights.

### C. Assuming error, Sanchez cannot show he was prejudiced by admission of the statements

Even assuming that admission of the recorded statements violated Sanchez's rights under the confrontation clause of the Sixth Amendment, he cannot show he was prejudiced thereby.

" ' "Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L. Ed. 2d 705, 87 S. Ct. 824]." [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error.' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159 (*Livingston*).)

Sanchez argues that, without Sandra M.'s statement that F.F. lived in the tent and that Sanchez was looking for him, the jury would have had no evidence to show that the motive for the shooting was because F.F. was a Norteño dropout. That is not so. F.F. testified at trial that he was a Norteño dropout and that he lived in the tent that Sanchez shot into that night. While the jury would not have heard that Sanchez asked for F.F. by his moniker before the shooting, F.F.'s testimony in conjunction with the gang expert's testimony regarding Norteño gang members' attitude toward dropouts and Sanchez's "D.O killa" tattoo were compelling evidence of Sanchez's motive.

29

Sanchez also suggests that the recorded statements were important to show premeditation because Sandra M. said that, after she told him F.F. was not present, he waited outside the tent for seven minutes before opening fire. Sanchez overlooks the evidence of timing from the surveillance videos, which showed that he parked near the tent city around 24 minutes before the shooting then exited the car 11 minutes before he shot into the occupied tent. This evidence independently demonstrated that Sanchez, a Norteño gang member with a "D.O killa" tattoo, spent nearly 30 minutes near the scene before opening fire into a tent where a Norteño dropout resided.

Accordingly, even without the recorded statements, " 'it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict ….' [Citation.]" (*Livingston*, *supra*, 53 Cal.4th at p. 1159.)

### D. No cumulative error

Sanchez next contends that the cumulative effect of the purported errors discussed above warrants reversal of the judgment. "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.) Here, we have found no errors, and where we assumed error, we also found no prejudice. Consequently, we reject Sanchez's cumulative error argument.

### E. Sentencing error

Sanchez raises several purported errors in his sentencing and, in the alternative, argues that trial counsel was ineffective in failing to object to these errors below. First, he argues that the aggravating factor that the victims were vulnerable was not supported by substantial evidence and, in any event, the jury instruction on this factor was erroneous. Second, Sanchez argues there was insufficient evidence to support the jury finding true the allegation that his attempted murder of Sandra M. (count 3) involved great violence, great bodily harm, threats of great bodily harm, or other acts disclosing a

30

high degree of cruelty, viciousness, or callousness. Third, Sanchez contends the trial court erred in relying on the aggravating factor that he was armed with or used a weapon at the time of the commission of the crime since use of a weapon was an element of the offenses alleged in counts 4 and 5. As discussed below, we do not find reversible error.

### 1. The trial court's prefatory remarks and Sanchez's sentence

Before pronouncing sentence, the trial court made the following remarks: "The Court has considered the issues and considered the facts and circumstances of this brutal, senseless crime and of the defendant's criminal history and his future potential in determining whether the dismissal of the enhancements in total or in part is appropriate or would endanger public safety. [¶] This was a cold, calculated and deliberate first degree murder. And the defendant is outwardly proud of his violent acts. His tattoos obtained before and after this event [] certainly shows that he is proud of his conduct. [¶] He has three prior commitments. He's engaged in crimes involving gang[s] and weapons for years and has shown no indication whatsoever of leaving that life. And I want him to understand that we understand what that life is about. That life is about fear and destruction, fear and destruction the gang has had on you and those close to you, and the fear and the destruction you have caused because of it. That is your life. That's the choices you've made. To live with fear, to be destroyed, and to cause fear to others and to destroy others. [¶] You've destroyed families. You've destroyed the life of a 17–year–old [*sic*] minor. And this is what you choose. And you seem to be quite proud of it. I hope in the time you spend in prison that you realize that's the whole life you have, fear and destruction. And maybe you can start thinking about something other than fear and destruction."

31

For the two counts of attempted murder (counts 2 and 3) and two counts of assault with a semiautomatic firearm, the trial court imposed upper term sentences[21] of nine years. In explaining its determinate sentencing decisions, the trial court stated it was imposing upper terms on counts 2 through 5 "based upon the factors of aggravation found by the jury and agreed with by this Court." Those two factors of aggravation were: (1) the charged offense involved great violence, great bodily harm, threats of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (rule 4.421(a)(1)); and (2) Sanchez was armed with or used a weapon at the time of the commission of the crime (rule 4.421(a)(2)).

### 2. Vulnerable victim factor

Sanchez argues that the jury's finding that the victims were particularly vulnerable was not supported by substantial evidence and that the jury was misinstructed on that factor. However, this aggravating factor was not alleged in connection with counts 2, 3, 4, or 5,[22] and thus the jury was not called upon to find it true or not true. The only count as to which the jury found it true was count 1, the murder of Adam G. At no point during the trial court's recitation of the jury verdicts did it state that the jury found Sandra M. or Brandon H. to be particularly vulnerable, nor did the verdict forms ask the jury to make any such finding as to any victim other than Adam G.

---

[21] The sentences on counts 4 and 5 were stayed pursuant to section 654.

[22] Section 1170, subdivision (b), applies when "a judgment of imprisonment is to be imposed and the statute specifies three possible terms . . . ." This statute "describes the sentencing court's discretion to choose an aggravated, middle, or lower *determinate* term based on its consideration of mitigating and aggravating factors. [Citations.]" (*People v. Estrada* (2020) 58 Cal.App.5th 839, 843 (*Estrada*).) Sanchez's conviction for murder in the first degree (count 1) carries a mandatory penalty of "death, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of 25 years to life." "Sentences … of a number of years to life … are not subject to the determinate sentencing law (§ 1170 et seq.). [Citations.]" (*Estrada*, *supra*.)

Because there is nothing in the record to support Sanchez's claims of error with respect to the jury's finding on this aggravating factor, we do not consider them further.

### 3. Aggravating factor as to Count 3 (Sandra M.)

Sanchez next argues that, because there was no evidence that Sandra M. suffered any physical injury in the shooting, the trial court should not have relied on the jury finding true the allegation that her attempted murder (count 3) "involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness." The Attorney General argues that Sanchez has forfeited this argument by failing to raise it at sentencing. We need not reach the Attorney General's forfeiture argument and ultimately conclude that Sanchez's claim has no merit.[23]

Sanchez's argument is premised on a faulty assumption: that physical harm to the victim is a necessary condition of the aggravating factor. The language of the aggravating factor is not so limited. It applies when the crime, in this case the attempted murder of Sandra M., involves "great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness." (Rule 4.421(a)(1).) Here, after not locating his intended victim, Sanchez fired blindly into a tent he knew was occupied by at least three other people, none of whom were (to anyone's knowledge) gang members or gang dropouts. Based upon our review of the record, there was substantial evidence to support the jury finding this crime involved "great violence, … threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness." (Rule 4.421(a)(1).)

---

[23] Since we address the merits of the argument, we need not and do not consider Sanchez's alternative argument that trial counsel was ineffective for failing to object on this ground at sentencing.

Accordingly, we conclude that the trial court did not err in applying the jury's true finding on this allegation to Sanchez's conviction on count 3.

### 4. Dual use of arming/using a firearm allegation in connection with counts 2 through 5

Sanchez argues that the jury was not properly instructed that it could not find true the allegation that use of a firearm as an aggravating factor because that fact is an element of the substantive offenses.[24]  In the alternative, he contends his trial counsel was ineffective for failing to request an appropriate instruction.  The Attorney General argues that Sanchez has forfeited the claim by failing to request a clarifying instruction, and alternatively, that his counsel was not ineffective because any error below was harmless.  Again, we do not reach the Attorney General's forfeiture argument, but conclude that, on the merits, any error was harmless.[25]

### a. No error in imposing upper term on attempted murder (counts 2 and 3)

We first address the trial court's allegedly improper use of the arming allegation as an aggravating factor for the attempted murders of Brandon H. (count 2) and Sandra M. (count 3).  Because being armed with or using a firearm is not an element of attempted murder (§§ 187, subd. (a), 667), use of that aggravating factor to impose an upper term for that offense would not constitute an improper dual use.  While it is true that an aggravated sentencing term may not be imposed by using the fact of an enhancement unless punishment for the enhancement is struck (§ 1170, subd. (b); rule 4.420(c)), the trial court here did dismiss the personal use of a firearm enhancements (§ 12022.53, subd. (c)) that had been alleged in connection with counts 2 and 3.  Because the trial court was

---

[24] The trial court relied on this aggravating factor in sentencing Sanchez on counts 2 through 5 and Sanchez does not expressly differentiate between those counts in his brief.

[25] See footnote 23, ante.

34

not precluded from relying on the aggravating factors found true by the jury in connection with counts 2 and 3, there was no error in imposing upper terms on both of those counts.

### a. Any error in imposing upper term on assault with a firearm (counts 4 and 5) was harmless beyond a reasonable doubt

We now analyze whether the trial court erred in relying on the arming allegation in imposing upper term sentences on counts 4 and 5. The Attorney General concedes, as to these counts, that the trial court could not rely on the jury's finding that Sanchez was armed as a factor in aggravation. "A circumstance which is an element of the substantive offense cannot be used as a factor in aggravation." (*People v. Clark* (1992) 12 Cal.App.4th 663, 666.) We agree that the trial court could not have relied on this factor in imposing an aggravated term. Because the trial court did not discriminate between the aggravating factors in announcing its sentencing decision, stating only that it was imposing upper terms "based upon the factors of aggravation found by the jury and agreed with by this Court[,]" we cannot say that the court did not commit sentencing error. However, as we explain below, any such error was harmless beyond a reasonable doubt.

The published opinions are in conflict on the standard of review to be applied when the court relies on multiple factors, some of which were not found by the jury or stipulated to by the defendant. (Compare *People v. Flores* (2022) 75 Cal.App.5th 495, 500 [remand not required if appellate court concludes beyond a reasonable doubt that a jury would have found at least one aggravating factor true] with *People v. Lopez* (2022) 78 Cal.App.5th 459, 466 (*Lopez*) [all aggravating factors must have been found true beyond a reasonable doubt; if only some factors would have been found true, it must be reasonably probable the same sentence would have been imposed based on those] and *People v. Dunn* (2022) 81 Cal.App.5th 394, review granted Oct. 12, 2022, S275655

[if at least one aggravating factor would have been found true beyond a reasonable doubt and it is reasonably probable any remaining aggravating factors relied on in imposing sentence would have been found true, assess likelihood of same sentence being imposed absent factors not meeting that standard].)  The issue is currently pending before our Supreme Court.  (See *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.)

At the first step of the *Lopez* analysis, the court, applying the standard set forth in *Chapman, supra*, 386 U.S. 18, decides whether "to conclude beyond a reasonable doubt that a jury would have found true beyond a reasonable doubt *every factor on which the court relied*, because the amended statute requires that every factor on which a court intends to rely in imposing an upper term, with the exception of factors related to a defendant's prior conviction(s), have been admitted by the defendant or proven to a jury." (*Lopez, supra*, 78 Cal.App.5th at p. 466.)  If so, then the error is not prejudicial.  (*Ibid.*)  If not, then the analysis proceeds to the second step, where "a reviewing court can be certain, to the degree required by *People v. Watson*[, *supra*, 46 Cal.2d at page 836], that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only" those aggravating factors that it could consider, "rather than all of the factors on which it previously relied." (*Id.* at p. 467, fn. 11.)  If not, "then it is clear that remand to the trial court for resentencing is necessary." (*Ibid.*)

Here, the jury found true two aggravating circumstances in conjunction with counts 4 and  5, specifically: (1) that the crimes involved great violence, great bodily harm, threat of great bodily harm, and other acts disclosing a high degree of cruelty, viciousness, and callousness; and (2) Sanchez was armed with or used a weapon at the time of the commission of the crimes.  The Attorney General concedes that the jury should not have been asked to determine whether the second circumstance was true, and

36

that the court was precluded from relying on that specific factor to impose an upper term sentence on counts 4 and 5. That is not the end of the inquiry, however, even under *Lopez*. Because the first factor, i.e., that the crimes involved great violence, etc., was a permissible aggravator, we examine whether we "can be certain, to the degree required by *People v. Watson*[, *supra*, 46 Cal.2d at page 836], that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only" this aggravating factor. (*Id.* at p. 467, fn. 11.) In this case, based on the court's extended description of the shooting as a "brutal, senseless crime" and Sanchez's "outward[] [pride in] his violent acts[,]" there is no reasonable probability that the trial court would have imposed anything other than the upper term on both counts 4 and 5. Consequently, such error was not prejudicial and we do not find remand for resentencing on these counts to be necessary.

### III. DISPOSITION

The judgment is affirmed.

37

_____

WILSON, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

BAMATTRE-MANOUKIAN, J.

H050599
*People v. Sanchez*